DIAZ, Justice,
concurring:
¶ 25. I concur with the majority opinion that the judgment of the trial court should be affirmed. I write separately to address the dissenting opinion that proffers the untenable suggestion that Stoner’s revenue impact statement was valid as filed.
¶26. The dissent suggests that the quoted paragraphs four (4) and five (5) in its opinion satisfy the statute’s call for a revenue impact statement due in part to the on-going public debate surrounding the cost/benefit analysis of gambling in Mississippi. I disagree. Even the most cursory glance at the numbers indicating the economic impact the gaming industry has had and continues to make on state and local government revenues shakes the unsteady ground upon which the dissent has firmly planted itself.
¶ 27. The dissent cites a 1995 law journal article which lists several negative economic impacts, leading the reader to believe that the article points to these financial repercussions as credible support for Stoner’s position. A careful reading of the direct quote in the article reveals otherwise:
To a certain extent, these negative' economic impacts are nothing more than natural market adjustments to the birth of a new and vigorous industry in the state. It is now harder to hire people to build homes in the state, but one can hardly complain about full employment in the construction industry. Similarly, it is hard to feel bad about casinos hiring people at good salaries and thereby driving up the cost of labor for other employers. If rental prices are artificially high in some areas today construction will eventually meet the demand and prices will come back down. If certain industries are now less profitable, that is just a reflection of the market at work. These adjustments are simple economic growing pains, inconvenient and undesirable to those who are directly impacted, but not a valid basis for challenging the gaming industry. Social issues, however, are an altogether different matter.
Ronald J. Rychlak, The Introduction of Casino Gambling: Public Policy and the Law, 64 Miss. L.J. 291, 332 (1995) (emphasis added).
¶ 28. There is much academic wrangling that rages on both sides of the legalized gambling debate concerning the social cost of gambling versus the economic benefit of the industry. That, however, is not the issue before us today. It is the province of the Legislature to address the various public policy issues interwoven in the financial fabric of the gaming industry. Thus, the focal point of this inquiry is economic only; specifically Stoner’s assertion in her revenue impact statement that the “initiative requires no reduction in any source of government revenue.” No statement could be further from the truth.
¶ 29. In a recent study entitled “Fiscal Year 1999 Economic Impact for Tourism and Recreation in Mississippi,”[1] several *404 important statistics are presented that reflect the enormity of the economic boost the gambling industry gives to both state and local governments. Gross gaming revenues surpassed the $2.3 billion mark in fiscal year (FY) 1999, a 12.2 percent increase over the $2.1 billion reaped in FY 1998. Total gaming-related tax revenues for Mississippi climbed 12.4 percent from $250.4 million in FY 1998 to $281.5 million in FY 1999. From this amount, local governments benefitted from $82.9 million in FY 1998 and $94 million in FY 1999 leaving general fund receipts to fill the State coffers in the neighborhood of $167.4 million and $187.5 million in FY 1998 and FY 1999, respectively.
¶ 30. About 56 million patrons visited the 29 state-licensed casinos[2] throughout FY 1999 with out-of-state residents accounting for 75 percent of that figure. Mississippi’s state-regulated casinos contributed $695.8 million in FY 1999 to the local and state economic tax scheme through their payrolls employing an average of 32,785 casino employees during that year. It is estimated that $3.8 billion in direct/initial and subsequent investments can be attributed to the state-licensed casinos through June 1999 without considering more recent land-based investments such as hotel construction, golf course developments, and recreational vehicle parks.
¶ 31. In light of this empirical data, Stoner can hardly be said to have complied with the dictates of Miss.Code Ann. § 23-17-1(3) (Supp.1999). The dissent unsuccessfully attempts to avoid the obvious by parsing the finest hair in drawing a distinction between the wording in the statute and the eventual effect of the initiative, saying “Technically, Stoner is correct when she says the initiative does not require a reduction in any source of revenue,” but a revenue loss may result as a consequence. Arguing that Stoner is correct in her evaluation of the economic forecast is akin to arguing that the failure to pay life insurance premiums does not require the insurer to cancel your policy, but only that cancellation may result.
¶ 32. While the process of having an initiative put before the electorate may be more complicated than need be, the statute requiring an accurate revenue impact statement is crystal clear. Allowing Stoner’s submission to pass muster under the applicable statutory language would lure this Court into placing a blind wager on the State’s economic vitality.
BANKS, P.J., AND McRAE, J„ JOIN THIS OPINION.

. Division of Tourism Development Research Unit, Mississippi Dep’t of Economic & Com-mumty Development, "Fiscal Tear 1999 Eco *404 nomic Impact for Tourism and Recreation in Mississippi” at 42-45 (Feb.2000).

. Tax revenue information and payroll statistics concerning the Silver Star Resort and Casino on the Choctaw Indian Reservation near Philadelphia are not included in this opinion as it is not regulated by the Mississippi Gaming Commission. Undeniably, it has had an economic impact of its own by virtue of the unique position it holds in the Choctaw community.